## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| **TEAMSTERS LOCAL 443 HEALTH SERVICES & INSURANCE PLAN**, on behalf of itself and all others similarly situated, | **Case No.** |
| Plaintiff, | |
| -against- | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| **JOHN W. GAMBLE, JR., JOSEPH M. LOUGHRAN, III, RODOLFO O. PLODER, RICHARD F. SMITH, JAMES E. COPELAND, JR., ROBERT D. DALEO, WALTER W. DRIVER, JR., MARK L. FEIDLER, G. THOMAS HOUGH, L. PHILLIP HUMANN, ROBERT D. MARCUS, SIRI S. MARSHALL, JOHN A. MCKINLEY, ELANE B. STOCK and MARK B. TEMPLETON,** | |
| Defendants, | |
| and, | |
| **EQUIFAX, INC.,** | |
| Nominal Defendant, | |

Plaintiffs Teamster Local 443 Health Services and Insurance Plan ("Teamsters Local 443" or "Plaintiff"), by their undersigned attorneys, derivatively and on behalf of Nominal Defendant Equifax, Inc. ("Equifax" or the "Company"), file this Verified Stockholder Derivative Complaint against Defendants Equifax, John W. Gamble, Jr., Joseph M. Loughran, III, Rodolfo O. Ploder, James E. Copeland, Jr., Robert D. Daleo, Walter W. Driver, Jr., Mark L. Feidler, G. Thomas Hough, L. Phillip Humann, Robert D. Marcus, Siri S. Marshall, John A. McKinley, Richard F. Smith, Elane B. Stock and Mark B. Templeton (the "Individual Defendants") (collectively, "Defendants") for breaches of their fiduciary duties to the Company. Plaintiff makes the following allegations based upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters, based on the investigation conducted by its attorneys. This investigation included, among other things, a review of the Company's announcements and press releases; filings made by the Company with the United States Securities and Exchange Commission ("SEC"); corporate governance documents available on the Company's website; governmental and regulatory investigations of the Company and documents relating thereto; and news reports and other publicly available information about the Company.

## I.    PRELIMINARY STATEMENT

1.    This shareholder derivative action arises from Defendants' breach of fiduciary duties owed to its shareholders in connection with its most recent cybersecurity breach, which was announced to the public on September 7, 2017.

2.    Despite warnings as early as March 2016 – when Equifax learned that its subsidiary, Equifax Workforce Solutions, had its website breached – that Equifax was in danger of serious data breaches that could expose to hackers the personal and financial data millions of Americans, Equifax and the other Defendants chose to do nothing to correct their inadequate internal controls over the Company's technology and data security.

3.    Due to Defendants' failure to protect against this known risk, on or about July 29, 2017, Equifax discovered an unauthorized intrusion into its massive data files, resulting in unauthorized access to the personal and financial data of nearly half of the American citizenry (the "Data Breach").

4.    Rather than immediately announcing the Data Breach, Equifax waited until September 7, 2017 to acknowledge that the Data Breach was discovered on July 29, 2017, potentially impacting approximately 143 million U.S. consumers. This data breach took place between May and July 2017, when cyber criminals exploited a U.S. website application vulnerability to gain access to Equifax files.

5.    Incredibly, between the time of the Data Breach and its public disclosure by Equifax, three Equifax executives brazenly sold at least $1.8 million

worth of shares, as follows: defendant John W. Gamble, Jr. ("Gamble"), Equifax's Corporate Vice President and Chief Financial Officer, sold shares worth $946,374 on August 1, 2017; defendant Joseph M. Loughran, III ("Loughran"), President of Equifax's United States Information Solutions ("USIS") business, exercised options to dispose of stock worth $584,099 on August 1, 2017; defendant Rodolfo O. Ploder ("Ploder"), Equifax's President of Workforce Solutions, sold shares worth $250,458 on August 2, 2017.

6.     Equifax failed to secure and safeguard consumers' personal and private information which it collects from various sources in connection with the operation of its business as a consumer credit reporting agency. The information obtained by hackers as a result of the Data Breach includes names, Social Security numbers, birth dates, addresses and, in some instances, driver's license numbers. In addition, Equifax admitted that credit card numbers for approximately 209,000 U.S. consumers, and certain dispute documents with personal identifying information for approximately 182,000 U.S. consumers, were accessed.

7.     Equifax failed to take adequate and reasonable measures to ensure its data systems were protected; failed to disclose to its customers the material fact that it did not have adequate computer systems and security practices in place to safeguard consumers' personal and private information; failed to take available steps to prevent and stop the breach from ever happening; and failed to monitor and detect the breach on a timely basis. As a direct result of Defendants' failures to

protect the consumer information they are tasked with safeguarding, the Company's stock price has plummeted, it is subject to multiple criminal and civil lawsuits, and it faces multiple public inquiries into the Data Breach, all of which have caused the Company to expend, and continue to expend, significant sums of money.

## II.    JURISDICTION & VENUE

8.    Pursuant to 28 U.S.C. §1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), this Court has jurisdiction over the claims asserted herein for violations of sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder. This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. §1367.

9.    This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

10.    Venue is proper in this Court in accordance with 28 U.S.C. §1391(a) because: (i) Equifax maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts

4

detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Equifax, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## III.   PARTIES & INTERESTED NON-PARTIES

### A.    PLAINTIFF

11.    Plaintiff Teamsters Local 443 Health Services & Insurance Plan ("Teamsters Local 443") is a resident of Connecticut and currently is and continuously has been a stockholder of Equifax since prior to May 2017.

### B.    NOMINAL DEFENDANT

12.    Nominal defendant Equifax is a Georgia corporation with its principal executive offices located at 1550 Peachtree Street NE, Atlanta, GA 30309. Equifax common stock trades on the New York Stock Exchange under the ticker symbol "EFX."

13.    Equifax is a leading global provider of information solutions and human resources business process outsourcing services for businesses, governments and consumers. Equifax is a consumer credit reporting agency in the United States that gathers and maintains information on over 800 million consumers and more than 88 million businesses worldwide. Along with Experian and TransUnion, Equifax is one of the three largest American credit agencies.

14.    Equifax has a large and diversified group of clients, including financial institutions, corporations, governments and individuals. Its products and services are based on comprehensive databases of consumer and business information derived from numerous sources including credit, financial assets, telecommunications and utility payments, employment, income, demographic and marketing data.

15.    In conducting business, Equifax acquires a substantial amount of information about individual consumers, including his or her full name; credit or debit card account number; card security code (the value printed on the card or contained in the microprocessor chip or magnetic stripe of a card and used to validate card information during the authorization process); the card's expiration date and verification value; and the PIN number for debit cards.

16.    Equifax uses advanced statistical techniques and proprietary software tools to analyze all available data, creating customized insights, decision-making solutions and processing services for their clients.  Equifax purports to help consumers understand, manage and protect their personal information and make more informed financial decisions.  Equifax also provides information, technology and services to support debt collections and recovery management.  Additionally, Equifax is a leading provider of payroll-related and human resource management business process outsourcing services in the US.

17.    Equifax currently operates in four global regions:  North America (U.S. and Canada), Asia Pacific (Australia and New Zealand), Europe (the United Kingdom, or U.K., Spain and Portugal) and Latin America (Argentina, Chile, Costa Rica, Ecuador, El Salvador, Honduras, Mexico, Paraguay, Peru and Uruguay).    Equifax maintains support operations in the Republic of Ireland. Equifax also offers branded credit services in Russia and India through joint ventures, has investments in consumer and/or commercial credit information companies through joint ventures in Cambodia, Malaysia and Singapore, and has an investment in a consumer and commercial credit information company in Brazil.

18.    Equifax originally was incorporated under the laws of the State of Georgia in 1913, and its predecessor company dates back to 1899.    Based in Atlanta, Georgia, Equifax has US $2.7 billion in annual revenue. Equifax is organized and reports its business results in four operating segments, as follows:

    a. **U.S. Information Solutions (USIS)** — provides consumer and commercial information solutions to businesses in the U.S. including online information, decisioning technology solutions, fraud and identity management services, portfolio management services, mortgage reporting and financial marketing services.

    b. **International** —which includes Equifax's Canada, Europe, Asia Pacific and Latin America business units, provides products and services similar to those available in the USIS operating segment but with variations by geographic region.  In Europe, Asia and Latin America, Equifax also provides information, technology and services to support debt collections and recovery management.

c. **Workforce Solutions** — provides services enabling Equifax's clients to verify income and employment (Verification Services) as well as to outsource and automate the performance of certain payroll-related and human resources management business processes, including unemployment cost management, tax credits and incentives and I-9 management services and services to allow employers to ensure compliance with the Affordable Care Act (Employer Services).

d. **Global Consumer Solutions** — provides products to consumers in the United States, Canada, and the U.K., enabling them to understand and monitor their credit and monitor and help protect their identity. Equifax also sells consumer and credit information to resellers who combine Equifax's information with other information to provide direct to consumer monitoring, reports and scores.

## C.    INDIVIDUAL DEFENDANTS – Officers

19.    Defendant John W. Gamble, Jr. ("Gamble") has served as Equifax's Corporate Vice President and Chief Financial Officer since May 2014. On August 1, 2017 Gamble sold shares worth $946,374. This transaction was not part of a 10b5-1 scheduled trading plan. Equifax paid defendant Gamble the following compensation as an executive:

| Year | Salary ($) | Bonus ($) | Stock Awards ($) | Option Awards ($) | Non-Equity Incentive Plan Comp. ($) | Change in Pension Value and Nonqualified Deferred Comp. Earnings ($) | All Other Comp. ($) | Total ($) |
|------|-----------|-----------|------------------|-------------------|-------------------------------------|---------------------------------------------------------------------|---------------------|-----------|
| 2016 | 632,243   | 0         | 1,244,532        | 0                 | 758,692                             | 443,000                                                             | 16,640              | 3,095,107 |
| 2015 | 609,693   | 0         | 1,462,409        | 0                 | 695,050                             | 266,700                                                             | 19,792              | 3,053,644 |
| 2014 | 353,077   | 0         | 5,983,154        | 0                 | 482,526                             | 96,400                                                              | 163,945             | 7,079,102 |

20.    Defendant Joseph M. Loughran, III ("Loughran") serves as President of Equifax's United States Information Solutions (USIS) business. Prior to being named to this role, Loughran served until July 2017 as the Equifax's Chief

8

Marketing Officer.    Prior thereto, he served as President, Global Consumer Solutions since January 4, 2010.    Loughran was also Senior Vice President, Corporate Development from April 2006 to December 2009.    On August 1, 2017 Loughran exercised options to dispose of stock worth $584,099.    This transaction was not part of a 10b5-1 scheduled trading plan.

21.    Defendant Rodolfo O. Ploder ("Ploder") has served as Equifax's President of Workforce Solutions since November 2015.    From April 2010 to November 2015, he served as President, U.S. Information Solutions.    Prior thereto, he served as President, International, from January 2007 to April 2010.    From February 2004 to January 2007, he was Group Executive, Latin America .    On August 2, 2017 Ploder sold shares worth $250,458.    This transaction was not part of a 10b5-1 scheduled trading plan.    Equifax paid defendant Ploder the following compensation as an executive:

| Year | Salary ($) | Bonus ($) | Stock Awards ($) | Option Awards ($) | Non-Equity Incentive Plan Comp. ($) | Change in Pension Value and Nonqualified Deferred Comp. Earnings ($) | All Other Comp. ($) | Total ($) |
|------|-----------|-----------|------------------|-------------------|------------------------------------|---------------------------------------------------------------------|---------------------|-----------|
| 2016 | 500,000 | 0 | 785,003 | 0 | 600,000 | 770,000 | 105,314 | 2,760,317 |
| 2015 | 462,273 | 0 | 944,479 | 0 | 554,726 | 93,800 | 24,831 | 2,080,109 |
| 2014 | - | - | - | - | - | - | - | - |

22.    Richard F. Smith ("Smith") has been Chairman and Chief Executive Officer of Equifax since September 2005.    Prior to joining Equifax, Smith spent 22 years with GE holding several president and chief executive officer roles across

numerous businesses including Engineering Thermoplastics, Asset Management, Leasing, and Insurance Solutions. Equifax paid defendant Smith the following compensation as a director:

| Year | Salary ($) | Bonus ($) | Stock Awards ($) | Option Awards ($) | Non-Equity Incentive Plan Comp. ($) | Change in Pension Value and Nonqualified Deferred Comp. Earnings ($) | All Other Comp. ($) | Total ($) |
|------|-----------|-----------|------------------|-------------------|-------------------------------------|--------------------------------------------------------------------|---------------------|-----------|
| 2016 | 1,450,000 | 0 | 7,323,095 | 0 | 3,045,000 | 3,027,100 | 119,368 | 14,964,563 |
| 2015 | 1,450,000 | 0 | 8,315,508 | 0 | 3,045,000 | 0 | 112,203 | 12,922,711 |
| 2014 | 1,450,000 | 0 | 6,159,236 | 0 | 2,345,184 | 3,815,200 | 110,055 | 13,879,675 |

**D.  INDIVIDUAL DEFENDANTS – Current Directors**

23.  L. Phillip Humann ("Humann") has been on the Equifax Board of Directors since 1992.  Humann serves on the Compensation, Human Resources & Management Succession Committee.  In 2016, Humann's total compensation from Equifax was $263,874.

24.  Mark B. Templeton ("Templeton") has been on the Equifax Board of Directors since 2008.  Templeton serves on the Audit Committee and Technology Committee.  In 2016, Templeton's total compensation from Equifax was $245,050.

25.  Robert D. Daleo ("Daleo") has been on the Equifax Board of Directors since 2006.  Daleo is the Chair of the Audit Committee and also serves on the Compensation, Human Resources & Management Succession Committee and Executive Committee.  In 2016, Daleo's total compensation from Equifax was $260,996.

26.    Siri S. Marshall ("Marshall") has been on the Equifax Board of Directors since 2006.  Marshall is the Chair of the Governance Committee and also serves on the Compensation, Human Resources & Management Succession Committee and Executive Committee.  In 2016, Marshall's total compensation from Equifax was $252,753.

27.    Walter W. Driver Jr. ("Driver") has been on the Equifax Board of Directors since 2007.  Driver serves on the Governance Committee.  In 2016, Driver's total compensation from Equifax was $238,867.

28.    John A. McKinley ("McKinley") has been on the Equifax Board of Directors since 2008.  McKinley is the Chair of the Technology Committee and also serves on the Audit Committee and Executive Committee.  In 2016, McKinley's total compensation from Equifax was $255,409.

29.    Mark L. Feidler ("Feidler") has been on the Equifax Board of Directors since 2007.  Feidler is the Chair of the Executive Committee and also serves on the Governance Committee and Technology Committee.  In 2016, Feidler's total compensation from Equifax was $255,972.

30.    Robert D. Marcus ("Marcus") has been on the Equifax Board of Directors since 2013.  Marcus is the Chair of the Compensation, Human Resources & Management Succession Committee and also serves on the Executive Committee and Governance Committee.  In 2016, Marcus's total compensation from Equifax was $241,975.

31.    G. Thomas Hough ("Hough") has been on the Equifax Board of Directors since 2016.  Hough serves on the Audit Committee and Technology Committee.  In 2016, Hough's total compensation from Equifax was $199,474.

32.    Elane Stock ("Stock") has been on the Equifax Board of Directors since January 1, 2017.  Stock serves on the Technology Committee.

33.    James E. Copeland, Jr. ("Copeland") is a former member of the Equifax Board of Directors.  In 2016, Copeland's total compensation from Equifax was $247,082.

## IV.    FIDUCIARY DUTIES

### A.    Duties of the Individual Defendants

34.    By reason of their positions as officers, directors, and/or fiduciaries of Equifax and because of their ability to control the business and corporate affairs of Equifax, the Individual Defendants owed and owe Equifax and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Equifax in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Equifax and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interests or benefit.

35.   To discharge their duties, the officers and directors of Equifax were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Equifax were required to, among other things:

    a.  ensure the Company complied with its legal obligations and requirements, including complying with regulatory requirements by devising and implementing a system of internal controls sufficient to ensure the Company's customers' personal and financial information is protected;

    b.  monitor and oversee the system of internal controls sufficient to ensure that the Company's customers' personal and financial information is protected;

    c.  conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

    d.  remain informed as to how Equifax conducted its operations, and upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices as necessary to comply with applicable laws; and

    e.  ensure the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

36.   The Individual Defendants, because of their positions of control and authority as directors and/or officers of Equifax, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

37.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Equifax, and was at all times acting within the course and scope of such agency.

**B.     Duties of the Board of Directors**

38.    According to the Notice of the 2017 Annual Meeting of Shareholders and Proxy Statement (the "Proxy Statement"), the Board of Directors of Equifax oversees risk management at the Company.  The Board exercises direct oversight of strategic risks to the Company and other risk areas not delegated to one of its committees.

39.    The Board of Directors monitors the Company's "tone at the top" and risk culture and oversees emerging strategic risks.  On an annual basis, the Board performs an enterprise risk assessment with management to review the principal risks facing the Company and monitors the steps management is taking to map and mitigate these risks.  The Board then sets the general level of risk appropriate for the Company through business strategy reviews.  Risks are assessed throughout the business, focusing on (i) financial, operational and strategic risk; and (ii) ethical, legal, privacy, data security (including cybersecurity), regulatory and other compliance risks.

## C.   Duties of the Audit Committee

40.    During the time of the events complained of herein, the Audit Committee included defendants Daleo, Hough, McKinley and Templeton.   The Audit Committee met five times in 2016.   See 2017 Proxy Statement, at 18.

41.    According to Equifax's website, the Audit Committee's primary function is to assist the Board of Directors in fulfilling its oversight responsibilities for:   (1) the integrity of the Company's statements and other financial information provided to any governmental body, its shareholders or the public;   (2) the Company's systems for complying with legal and regulatory requirements;   (3) the independent auditor's qualifications, independence, and performance;   (4) the performance of the Company's internal audit function;   and (5) the integrity of the Company's internal controls regarding finance, accounting, and auditing, and its financial reporting processes.

42.    In addition, according to Equifax's Proxy Statement, the Audit Committee reviews risks related to financial reporting;   discusses material violations, if any, of the Company's ethics, legal, regulatory and other compliance policies.   The Audit Committee also considers their annual audit risk assessment which identifies internal control risks and drives the internal and external audit plan for the ensuing year.   Last, the Audit Committee considers the impact of risk on the Company's financial position and the adequacy of the Company's risk-related internal controls.

### D.   Duties of the Compensation, Human Resources & Management Succession Committee

43.    During the time of the events complained of herein, the Compensation, Human Resources & Management Succession Committee included defendants Marcus, Daleo, Humann and Marshall.  The Compensation, Human Resources & Management Succession Committee met four times in 2016.  *See* 2017 Proxy Statement, at 18.

44.    According to Equifax's website, the primary function of the Compensation, Human Resources and Management Succession Committee is to assist the Board of Directors in fulfilling its oversight responsibility with respect to:  (1) determining and evaluating the compensation of the Chief Executive Officer; (2) approving and monitoring the executive compensation plans, policies and programs of the Company; (3) reviewing and discussing with management the Compensation Disclosure and Analysis ("CD&A") to be included in the Company's annual proxy statement and determine whether to recommend to the Board that the CD&A be included in the proxy statement; and (4) advising management on succession planning and other significant human resources matters.  In addition, according to Equifax's Proxy Statement, the Compensation Committee reviews compensation, human resource and management succession risks.

### E.    Duties of the Executive Committee

45.    During the time of the events complained of herein, the Executive Committee included defendants Feidler, Daleo, Marcus, Marshall and McKinley. The Executive Committee did not meet in 2016. *See* 2017 Proxy Statement, at 18.

46.    According to Equifax's website, the Executive Committee is authorized by the Bylaws of the Company to exercise all of the powers of the Board in managing the business and property of the Company during the intervals between meetings of the Board of Directors, subject to Board discretion or as limited by applicable laws.

### F.    Duties of the Governance Committee

47.    During the time of the events complained of herein, the Governance Committee included defendants Marshall, Driver, Feidler and Marcus.    The Governance Committee met four times in 2016. *See* 2017 Proxy Statement, at 18.

48.    According to Equifax's website, the Governance Committee assists the Board with respect to (1) Board organization, membership, and function, (2) committee structure and membership, and (3) oversight of evaluation and compensation of the Board.    In addition, according to the Proxy Statement, the Governance Committee focuses on corporate governance risks, including evaluation of the Company's leadership and risk oversight structure.

**G.    Duties of the Technology Committee**

49.    During the time of the events complained of herein, the Technology Committee included defendants McKinley, Feidler, Hough, Stock and Templeton.

50.    According to Equifax's Proxy Statement, the Technology Committee focuses on technology-related risks and opportunities, including data security. The Technology Committee oversees the Company's mitigation of any identified enterprise-wide risks in the following areas: information technology strategy; significant new product lines or technology investments; and the Company's response to external technology-based threats and opportunities. In addition,.

51.    In addition, the goals and responsibilities of the Technology Committee are to monitor the Company's long-term strategy and significant investments in the areas listed below:

    a.  Information technology long-term strategy in support of the Company's evolving global business needs.

    b.  Review and present observations to the Board with respect to the annual technology budget.

    c.  Significant new product development programs (including software initiatives) and new technology investments, including technical and market risks associated with product development and investment.

    d.  Future trends in technology that may affect the Company's strategic plans, including overall industry trends and new opportunities and

threats occasioned by new technologies, especially disruptive technologies.

e. Review the Company's technology investments and infrastructure associated with risk management, including policies relating to information security, disaster recovery and business continuity.

f. Assess the scope and quality of the Company's intellectual property.

g. Undertake from time to time such additional activities within the scope of the Committee's primary purposes as it may deem appropriate and/or as assigned by the Board of Directors, the Chairman of the Board and Chief Executive Officer.

## H.  Duties Arising From Equifax's Business Code of Conduct and Ethics

52.    During the time of the events complained of herein, Equifax's Code of Ethics and Business Conduct, which applied to all of the Individual Defendants, provided in pertinent part:

> Violating relevant laws, regulations or the Code, or encouraging others to do so, exposes the Company to liability and puts our reputation at risk.  If an ethics or compliance problem does occur, you are required to report it so that an effective solution can be developed.

*       *       *

> One of our most valuable assets is information.  Each of us must be vigilant and protect confidential information.  This means keeping it secure, limiting access to those who have a need to know in order to do their job, and avoiding discussion of confidential information in public areas … Confidential information includes all non-public

19

information that might be of use to competitors, or harmful to the Company or its customers, if disclosed.

\*        \*        \*

Our customers and our business partners place their trust in us. We must protect their confidential information. MAKE SURE YOU: Learn about the types of information which are given heightened protection by the law and Company policy (such as personally identifiable information, like social security numbers and bank account numbers) and protect them through appropriate means (such as encryption or other types of limited access). Never share confidential information inside or outside the Company except as authorized. Immediately report any loss or theft of confidential information.

\*        \*        \*

Business partners, government officials and the public need to be able to rely on the accuracy and completeness of our disclosures and business records. Accurate information is also essential within the Company so that we can make good decisions. Our books and records must be clear, complete and in compliance with accepted accounting rules and controls. Employees with a role in financial or operational recording or reporting have a special responsibility in this area, but all of us contribute to the process of recording business results and maintaining records. Each of us is responsible for helping to ensure the information we record is accurate and complete and maintained in a manner that is consistent with our system of internal controls. If you suspect any irregularity relating to the integrity of our records, you need to report it immediately to your supervisor, the Legal Department or the Corporate Ethics Officer.

\*        \*        \*

Insider Trading

No Equifax employee, officer, director or other "insider" may purchase or sell Equifax securities while in possession of material, nonpublic information relating to Equifax ("insider trading").

*See* Equifax, *Code of Ethics and Business Conduct*, https://www.equifax.com/assets/corp/code_of_ethics.pdf (last visited September 13, 2017).

## I.    Duties Arising from Equifax's Privacy Policies

53.    In addition to their general duties to ensure that systems were in place to safeguard customers' information to prevent the risk of foreseeable harm to others, the Individual Defendants were at all relevant times obligated to establish systems to safeguard such information by, among other things, rules governing payment card transactions, industry standards, various federal and state laws, and its own commitments, internal policies and procedures.

54.    Equifax has continuously acknowledged this legal duty and reassured the public that this duty was being met in the Company's "Privacy Policy" posted on its website.  For example, the policy currently tells the public that Equifax has "built our reputation on our commitment to deliver reliable information to our customers (both businesses and consumers) and to protect the privacy and confidentiality of personal information about consumers.  We also protect the sensitive information we have about businesses.  Safeguarding the privacy and security of information, both online and offline, is a top priority for Equifax." *See* Equifax, *Privacy*, http://www.equifax.com/privacy (last visited September 13, 2017).

## V.    BREACHES OF FIDUCIARY DUTIES

55.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its stockholders the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.    The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Equifax, an absence of good faith on their part, and a reckless disregard for their duties to the Company and its stockholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.    The conduct of the Individual Defendants who also were officers and/or directors of the Company have been ratified by the remaining Individual Defendants who collectively comprised all of Equifax's Board.

56.    The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to misrepresent its protection of consumer and business data and delay the reporting of the Data Breach, as detailed herein.    In addition, as a result of defendants' course of conduct, the Company is now the subject of consumer class actions and a securities class action alleging securities law violations in connection with the

improper financial reporting.  As a result, Equifax has expended, and will continue to expend, significant sums of money.

## VI.   CONSPIRACY, AIDING AND ABETTING AND CONCERTED ACTION

57.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

58.    During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company had experienced massive data breaches; (ii) enhance the Individual Defendants' executive and directorial positions at Equifax and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions; and (iii) deceive the Company's users and the investing public, including stockholders of Equifax, regarding the Individual Defendants' management of Equifax's operations.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

59.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused the Company to fail to disclose the Data Breach, which negatively impacted the Company's performance.

60.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of federal securities laws, breach of fiduciary duties, and unjust enrichment, and to conceal adverse information concerning the Company's operations and future business prospects.

61.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

62.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing,

substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## VII.  SUBSTANTIVE ALLEGATIONS

### A.  Background on Data Breaches

63.    Theft of customer data through breaches of retailers' point of sale systems hit the mainstream in 2007, when TJX Companies Inc. ("TJX") admitted in an SEC filing that at least 45.6 million credit and debit card numbers were stolen from its customers over an 18-month period. In addition, TJX disclosed that personal data provided in connection with the return of merchandise without receipts by about 450,000 customers had been stolen. The breach cost the company over $250 million, including costs related to improving the company's computer system, as well as costs related to lawsuits, investigations and other claims stemming from the breach.

64.    In early 2009, payment processor Heartland Payment Systems announced the largest data breach ever at that time to affect an American company. Heartland's breach exposed information from approximately 130 million credit and debit cards to cybercriminals.  Malware planted on Heartland's network recorded card data as it arrived from retailers.  Because the company processed payments for more than 250,000 businesses across the country, the impact was huge.

65.    In April 2011, attackers targeted the Sony PlayStation Network that links Sony's home gaming consoles, as well as Sony Online Entertainment, which

hosts massively multiplayer online PC games, and the Qriocity video and music-streaming service. Initially, Sony said that only the personal information of 78 million PlayStation Network users – login credentials, names, addresses, phone numbers and email addresses – had been exposed, but the tally of compromised accounts rose by 24.6 million when investigators discovered the attackers had also penetrated SOE and Qriocity. The credit-card data of approximately 23,400 SOE users in Europe was also stolen. Following the initial breach disclosure, the PlayStation Network went dark worldwide for more than three weeks.

66.    In November 2013, retail giant Target was the target of a cyber-attack that affected more than 41 million of the company's customer payment card accounts. Cyber attackers gained access to Target's computer gateway served through credentials stolen from a third-party vendor. Using the credentials to exploit weaknesses in Target's system, the attackers gained access to a customer service database, installed malware on the system and captured full names, phone numbers, email addresses, payment card numbers, credit card verification codes, and other sensitive data. Along with affecting 41 million customer payment card accounts, the breach affected contact information for more than 60 million Target customers.

67.    In September 2014, hardware and building-supplies warehouse retailer Home Depot admitted what had been suspected for weeks. Beginning in April or May of the same year, "carders" had infected its point-of-sale systems at

stores in the U.S. and Canada with malware that pretended to be antivirus software, but instead stole customer credit and debit cards. Fifty-six million payment cards were compromised as a result of this breach.

68.    In February 2015, Anthem, formerly known as WellPoint and the second-largest health insurer in the U.S., revealed its customer database had been breached as a result of a cyberattack on its IT system. Stolen data included names, addresses, dates of birth, Social Security numbers, email addresses, employment information and income data. As many as 80 million patient and employee records were exposed.

69.    In September 2015, credit reporting agency Experian said that a data breach at one of its business units may have compromised the personal records of about 15 million people including customers of T-Mobile. Hackers appear to have obtained access to an Experian server – one that is not a part of its consumer credit bureau, the company said – that hosted the personal information of people who applied for the carrier's services between September 1, 2013 and Sept. 16, 2015. The information accessed included names, addresses, Social Security numbers, dates of birth, driver's license numbers, and passport IDs, Experian said.

**B.    Equifax Was Aware of Its Vulnerability to Data Breaches**

70.    The Individual Defendants were – and at all relevant times have been – aware that the information Equifax maintains about its customers is highly

sensitive and could be used for nefarious purposes by third parties, such as perpetuating identity theft and making fraudulent purchases.

71.    Because of the sensitivity of the information Equifax maintains, the Individual Defendants are – and at all relevant times have been – aware of the importance of safeguarding the Company's customers' information and of the foreseeable consequences that would occur if its security systems were breached, specifically including the risk of massive liability to financial institutions and consumers, as well as potential exposure to criminal and civil liability and loss of reputation.

72.    Indeed, as early as in 2001, Equifax realized the importance of protecting consumer privacy. In its annual report, filed with the SEC on March 12, 2002, Equifax stated, "it is the Company's policy to treat all information with a high degree of security reflecting our recognition of individuals' privacy concerns." *See* Equifax 2001 Form 10-K, at 4.

73.    Equifax further identified the potential repercussions of a data security breach as a substantial "Risk Factor" for its business in its annual report, filed with the SEC on March 11, 2004, stating: "Security is important to our business, and breaches of security, or the perception that e-commerce is not secure, could harm our business."

74.    In addition to their general duties to ensure that systems are in place to safeguard customers' information to prevent the risk of loss, the Individual

Defendants were – and at all relevant times have been – obligated to oversee the Company's compliance, industry standards and various federal and state laws, as well as with the Company's own commitments, internal policies and procedures.

75.    Equifax continuously has acknowledged this legal duty and reassured the public its duty was being met in the company's "Privacy Policy" posted on its website. Equifax's policy states: "We have built our reputation on our commitment to deliver reliable information to our customers (both businesses and consumers) and to protect the privacy and confidentiality of personal information about consumers. We also protect the sensitive information about businesses. Safeguarding the privacy and security of information, both online and offline is a top priority for Equifax."

76.    Despite Equifax's early claims of protection of consumer information, Defendants did little to safeguard it.

77.    According to an October 6, 2017 news article in The Wall Street Journal, titled, "A Warning Shot on Equifax: Index Provider Flagged Security Issues Last Year," financial company MSCI, Inc. ("MSCI") warned in August of 2016 that Equifax wasn't equipped for the "increasing frequency and sophistication of data breaches." After poring over the Equifax records, MSCI said it found zero evidence that the credit scoring company conducted regular cybersecurity audits or provided training to employees on identifying risks, nor did it have any emergency plans to handle a data breach or leak. Due to these

29

cybersecurity concerns, MSCI removed Equifax from its stock indices, which evaluate companies based on environmental, social and governance criteria. "If you're an investor or asset manager and you see these rock-bottom evaluations of Equifax, it had to have given you pause," Jon Hale, head of sustainability research at Morningstar Inc., told The Wall Street Journal.

78.     Then, Equifax disclosed in May 2017 that its subsidiary Equifax Workforce Solutions, a/k/a TALX Corporation ("TALX"), which provides online payroll, HR and tax services, had its W-2 Express website breached. This breach continued from April 2016 through March 2017. Equifax refused to say how many consumers were impacted by the breach, but because this incident exposed the tax and payroll records of its customers' employees, the victim customers in turn were required to notify their employees as well. Then, five companies that used TALX publicly disclosed data breaches, including defense contractor giant Northrop Grumman; staffing firm Allegis Group; Saint-Gobain Corp.; Erickson Living; and the University of Louisville.

79.     Incredibly, Equifax's TALX division had amazingly lax security: it let customers who use the firm's payroll management services authenticate to the service with little more than a 4-digit personal identification number (PIN). Identity thieves who specialize in perpetrating tax refund fraud figured out that they could reset the PINs of payroll managers at various companies just by answering some multiple-guess questions — known as "knowledge-based

authentication" or KBA questions — such as previous addresses and dates that past home or car loans were granted.

80.    National grocery-chain Kroger, another company which used TALX, also was the target of this type of breach.  Once again, Equifax said the identity thieves were able to reset the 4-digit PIN given to customer employees as a password and then steal W-2 tax data after successfully answering personal questions about those employees.  In response to these breaches, a fraud analyst with Garnter, Inc. noted that, "It's pretty unbelievable that a company like Equifax would only protect such sensitive data with just a PIN."

**C.    The May-July 2017 Data Breach and Response**

81.    On July 29, 2017, Equifax's Security team observed "suspicious network traffic" associated with its online web portal and blocked it.

82.    Yet it was not until a September 7, 2017 press release that Equifax announced on July 29, 2017, the Company discovered a "cybersecurity incident potentially impacting approximately 143 million U.S. consumers.  Criminals exploited a U.S. website application vulnerability to gain access to certain files. Based on the company's investigation, the unauthorized access occurred from mid-May through July 2017."

> The Company announced that the information obtained by hackers was widespread and detailed, and included "names, Social Security numbers, birth dates, addresses and, in some instances, driver's license numbers.  In addition, credit card numbers for approximately 209,000 U.S. consumers, and certain dispute documents with personal

identifying information for approximately 182,000 U.S. consumers, were accessed." Equifax further stated that it had immediately retained "a leading, independent cybersecurity firm." That firm -- Mandiant -- "has been conducting a comprehensive forensic review to determine the scope of the intrusion, including the specific data impacted."

83.    On September 26, 2017, the Board of Equifax announced that Richard Smith would "retire" as Chairman of the Board of Directors and Chief Executive Officer, effective immediately.

~~84.~~    On October 2, 2017, Equifax announced the results of the investigation performed by Mandiant: an additional 2.5 million U.S. consumers potentially were impacted, bringing the total number of persons and entities whose data was exposed in the Data Breach to 145.5 million.

85.    Unbelievably, as noted in a "Wired" Blogspot by Ron Fein titled, "Equifax Deserves the Corporate Death Penalty," more than one week after the Data Breach was disclosed, "a small computer company in Milwaukee noticed that in one Equifax computer system based in South America, customer records could still be accessed by entering the username 'admin' and the password ... 'admin.'"

86.    The Defendants continued to fail in their responsibilities even one month after the Data Breach. The website Clark, in an article by Craig Johnson titled "Equifax Data Breach: Embattled credit bureau says it was hacked again," reported on October 12, 2017 that Equifax confirmed that it was hacked again, this time with a fake Flash installer application. As a result of this announcement, the

stock's price dropped from $113.10 per share on October 11, 2017 to $108.81 per share on October 12, 2017.

87.    On or about October 16, 2017, as reported on the website CISOMAG, which describes itself as "the handbook for Chief Information Security Officers," Equifax on October 12, 2017, "temporarily lost a fraud prevention contract worth $7.25 million with the IRS that it had received on September 29, 2017." The IRS's "precautionary measure" put on hold the multi-million-dollar deal after the discovery of the October 12, 2017 incident set forth above. Thus, not only did the Defendants' malfeasance cost the Company in expenses for legal matters and the decline of its stock price, but it cost Equifax millions of dollars in business deals.

88.    As set forth above, Equifax had ample notice of the potential risk associated with a data breach, which as noted in the Company's annual reports, would subject the Company to litigation, regulatory fines, penalties, reputational damage and loss of business, any of which could have a material effect on its cash flows, competitive position, financial condition or results of operations. During the time of the events complained of herein, the Individual Defendants were well-aware that a data security breach such as the one that occurred on July 29, 2017 was a substantial "Risk Factor" for the Company.

## DEFENDANTS' IMPROPER STATEMENTS

89.    As set forth above, in the early 2000s, reports of breaches of major retailers' point of sale systems became commonplace and an issue of concern for the Company.

90.    In its FY 2008 annual report filed with the SEC on February 26, 2009, Equifax identified the potential repercussions of a data security breach as a substantial "Risk Factor" for its business:

> **If we are unable to protect our information systems against data corruption, cyber-based attacks or network security breaches, our operations could be disrupted.**
>
> …Security breaches of this infrastructure can create system disruptions, shutdowns or unauthorized disclosure of confidential information. If we are unable to prevent such breaches, our operations could be disrupted, or we may suffer financial damage or loss because of lost or misappropriated information.
>
> …Security breaches in connection with the delivery of our products and services via ePORT, our Personal Solutions website, or well-publicized security breaches not involving the Internet that may affect us or our industry, such as database intrusion, could be detrimental to our reputation, business, operating results and financial condition. We cannot be certain that advances in criminal capabilities, new discoveries in the field of cryptography or other developments will not compromise or breach the technology protecting the networks that access our products, consumer services and proprietary database information.

*See* Equifax 2008 Form 10-K, at 20.

91.    The Company's FY 2009, and FY 2010 10-Ks, filed with the SEC on February 23, 2010, February 23, 2011, respectively, all included a similar warning. *See* Equifax 2009 Form 10-K, at 20 and Equifax 2010 Form 10-K, at 16.

92.    By the end of FY 2011, the warnings contained in the Company's annual report, filed with the SEC on February 23, 2012, were amended to reflect the Individual Defendants' awareness that the risk of failing to secure a significant amount of customer data was among the top risks facing Equifax and could cause its business and reputation to suffer, as follows:

> **Security breaches and other disruptions to our information technology infrastructure could interfere with our operations, and could compromise Company, customer and consumer information, exposing us to liability which could cause our business and reputation to suffer.**
>
> …Despite our substantial investment in security measures and business continuity plans, our information technology networks and infrastructure may be vulnerable to damage, disruptions or shutdowns due to attacks by hackers or breaches due to employee error or malfeasance, or other disruptions during the process of upgrading or replacing computer software or hardware, power outages, computer viruses, telecommunication or utility failures or natural disasters or other catastrophic events. The occurrence of any of these events could compromise our networks and the information stored there could be accessed, publicly disclosed, lost or stolen. Any such access, disclosure or other loss of information could result in legal claims or proceedings, liability or regulatory penalties under laws protecting the privacy of personal information, disrupt operations, and damage our reputation, which could adversely affect our business in lost sales, fines or lawsuits.

*See* Equifax 2011 Form 10-K, at 17.  (Emphasis supplied).

93.    By the end of FY 2012, the statements contained in the Company's annual report, filed with the SEC on February 22, 2013 once again were amended to state, in part, as follows:

> **Security breaches and other disruptions to our information technology infrastructure could interfere with our operations, and could compromise Company, customer and consumer information, exposing us to liability which could cause our business and reputation to suffer.**
>
> … Although we are not aware of any material breach of our data, properties, networks or systems, if one or more of such events occur, this potentially could compromise our networks and the information stored there could be accessed, publicly disclosed, lost or stolen. Any such access, disclosure or other loss of information could subject us to litigation, regulatory fines, penalties or reputational damage, any of which could have a material effect on our cash flows, competitive position, financial condition or results of operations.

*See* Equifax 2012 Form 10-K, at 17.   (Emphasis supplied).

94.    The Company's FY 2013, FY 2014, FY 2015, and FY 2016 10-Ks, filed with the SEC on February 28, 2014, February 25, 2015, February 24, 2016, and February 22, 2017, respectively, all included the aforementioned statement. *See* Equifax 2013 Form 10-K, at 16; Equifax 2014 Form 10-K, at 17; Equifax 2015 Form 10-K, at 17; and Equifax 2016 Form 10-K, at 16.

95.    On March 25, 2016, defendants Copeland, Daleo, Driver, Feidler, Humann, Marcus, Marshall, McKinley, Smith and Templeton caused Equifax to file with the SEC a Proxy Statement on Schedule 14A in connection with the 2016 Annual Meeting of Stockholders, held on May 4, 2016 (the "2016 Proxy"). In the

2016 Proxy, Defendants solicited stockholder votes to, among other things, re-elect defendants Copeland, Daleo, Driver, Feidler, Humann, Marcus, Marshall, McKinley, Smith and Templeton.    Defendants issued materially misleading statements with respect to the solicited votes, as follows:

**Board Risk Oversight**

Our Board oversees risk management at the Company. The Board exercises direct oversight of strategic risks to the Company and other risk areas not delegated to one of its committees.

On an annual basis, the Board performs an enterprise risk assessment with management to review the principal risks facing the Company and monitors the steps management is taking to map and mitigate these risks. The Board then sets the general level of risk appropriate for the Company through business strategy reviews. Risks are assessed throughout the business, focusing on (i) financial, operational and strategic risk, and (ii) ethical, legal, security, regulatory and other compliance risks.

Each business unit and corporate support unit has primary responsibility for assessing and mitigating risks within their respective areas of responsibility. Our CEO and senior leadership team receive comprehensive periodic reports on the most significant risks from these units and from the head of our internal audit department.

*    *    *

Audit Committee:    Reviews risks related to financial reporting; discusses material violations, if any, of Company ethics, legal, regulatory and other compliance policies.

*    *    *

Governance Committee:    Focuses on corporate governance risks, including evaluation of our leadership and risk oversight structure to ensure that it remains the optimal structure for our Company and shareholders.

Technology Committee:    Focuses on technology-related risks and opportunities, including information security.

*See* 2016 Proxy Statement, at 20-21.

96.    The 2016 Proxy claimed that: (i) the Board was effective in overseeing Equifax's risk management; (ii) the Audit Committee was effective in fulfilling its oversight responsibilities with respect to material violations of Company ethics, legal, regulatory and other compliance policies; (iii) the Governance Committee was effective in fulfilling its oversight responsibilities with respect to leadership and risk oversight structure; and (iv) the Technology Committee was effective in fulfilling its oversight responsibilities with respect to technology-related risks and information security.    These statements were misleading because the 2016 Proxy omitted any disclosures reflecting or acknowledging the Defendants' failure to secure consumer data and the lack of internal controls necessary to prevent data breaches.

97.    On March 24, 2017, defendants Copeland, Daleo, Driver, Feidler, Hough, Humann, Marcus, Marshall, McKinley, Smith, Stock and Templeton caused Equifax to file with the SEC a Proxy Statement on Schedule 14A in connection with the 2017 Annual Meeting of Stockholders, held on May 4, 2017 (the "2017 Proxy").  In the 2017 Proxy, defendants solicited stockholder votes to, among other things, re-elect defendants Daleo, Driver, Feidler, Hough, Humann,

Marcus, Marshall, McKinley, Smith, Stock and Templeton.  Defendants issued materially misleading statements with respect to the solicited votes as follows:

### Board Risk Oversight

Our Board oversees risk management at the Company. The Board exercises direct oversight of strategic risks to the Company and other risk areas not delegated to one of its committees.

\*        \*        \*

Board of Directors:  Monitors our "tone at the top" and risk culture and oversees emerging strategic risks.  On an annual basis, the Board performs an enterprise risk assessment with management to review the principal risks facing the Company and monitors the steps management is taking to map and mitigate these risks.  The Board then sets the general level of risk appropriate for the Company through business strategy reviews.  Risks are assessed throughout the business, focusing on (i) financial, operational and strategic risk, and (ii) ethical, legal, privacy, data security (including cybersecurity), regulatory and other compliance risks.

\*        \*        \*

Audit Committee:  Reviews risks related to financial reporting; discusses material violations, if any, of Company ethics, legal, regulatory and other compliance policies.

\*        \*        \*

Governance Committee:  Focuses on corporate governance risks, including evaluation of our leadership and risk oversight structure to ensure that it remains the optimal structure for our Company and shareholders.

\*        \*        \*

Technology Committee:  Focuses on technology-related risks and opportunities, including data security.

*See* 2017 Proxy Statement, at 21.

98.    The 2017 Proxy claimed that: (i) the Board was effective in overseeing Equifax's risk oversight; (ii) the Audit Committee was effective in fulfilling its oversight responsibilities with respect to material violations of Company ethics, legal, regulatory and other compliance policies; (iii) the Governance Committee was effective in fulfilling its oversight responsibilities with respect to leadership and risk oversight structure; and (iv) the Technology Committee was effective in fulfilling its oversight responsibilities with respect to technology-related risks and data security.    These statements were misleading because the 2017 Proxy omitted any disclosures of the Defendants' failure to secure consumer data and the lack of internal controls necessary to prevent data breaches.

### D.    Reaction and Public Outcry Over Data Breaches

99.    In the face of the disastrous Data Breach and Defendants' misleading statements as set forth above, pushback against Equifax and the Defendants was fierce.

100.    On October 3, 2017, Mr. Smith went before the U.S. House of Representatives and was pressed on how a credit bureau of Equifax's size, responsible for safeguarding billions of sensitive records on Americans' financial lives, could have allowed so much data to escape, unnoticed.    "How does this happen when so much is at stake?" asked Representative Greg Walden, Republican

of Oregon. "I don't think we can pass a law that, excuse me for saying this, fixes stupid. I can't fix stupid."

101.   During the hearing, on multiple occasions, Mr. Smith referred to an "individual" in Equifax's technology department who had failed to heed security warnings and did not ensure the implementation of software fixes that would have prevented the breach.  Equifax previously said that an unpatched software flaw had been to blame for the massive security breach, but on October 3, Mr. Smith went a step further, describing the "human error and technology failures" that turned a single oversight into a data breach that allowed attackers to obtain personal details on nearly half of America's population.

102.   In early March, the Department of Homeland Security sent Equifax and other companies an alert about a critical vulnerability in software that Equifax used in an online portal for recording customer disputes.   Equifax sent out an internal email requesting the technical staff fix to the software, but, in effort to lay the blame at an anonymous doorstep, according to Smith, "an individual did not ensure communication got to the right person to manually patch the application." was compounded by a technical error: the scanning software that Equifax used to detect vulnerabilities failed to find the unpatched hole, he said.

103.   In addition, Sen. Elizabeth Warren, D. Mass., forced former Equifax CEO Richard Smith to admit that the credit reporting agency profits from data breaches during the hearing.  Warren quoted Smith's previous description of fraud

as a "huge opportunity for us." "Now, Mr. Smith, now that information for about 145 million Americans has been stolen, is fraud more likely now than before that hack?" Warren asked. "Yes, Senator, it is," Smith replied. "So the breach of your system has actually created more business opportunities for you," Warren said. The result, Warren said, was the Company would have little incentive to invest in security measures to protect consumers' personal data.

104.   Lawmakers also grilled Mr. Smith about the stock sales by Defendants Gamble, Loughran and Ploder, who sold shares worth almost $1.8 million in the days after the breach was discovered, but before it was disclosed. The sales were approved by John J. Kelley III, Equifax's chief legal officer, who knew at the time that the company's technical department had detected suspicious activity on Equifax's network. Smith, however, described them as "honorable men of integrity" who were unaware of the technical investigation.

### E.    Equifax Business Has Suffered as a Result of the Breach

105.   As set forth above, as a result of the repeated data breaches, on or about October 12, 2017, Equifax lost a fraud prevention contract worth $7.25 million with the IRS that it had received on September 29, 2017.

106.   On October 17, 2017 the Government Accountability Office ("GAO") rejected Equifax's appeal of the loss of the contract to provide assistance in preventing identity theft. The GAO conducted a review and concluded that the IRS was justified in shifting the one-year agreement to Experian.

107.   Indeed, as set forth on CNBC's website on September 8, 2017, in an article titled, "Equifax shares plunge the most in 18 years as Street says breach will cost company hundreds of millions," analysts  predicted that the Data Breach will cost the Company hundreds of millions of dollars and "costs could drag on for a number of years[,]" as follows:

> "Based on large scale breaches at Target and Home Depot, **we [Stifel] believe $300M-$325M in gross costs for the breach would not be unreasonable[.]**"

*      *      *

> The "significant data breach is likely to cost the company materially, and costs could drag on for a number of years," analyst Shlomo Rosenbaum [of Stifel] wrote in a note to clients Friday. "We aren't changing estimates right now because of lack of clarity, **though clearly ours and consensus estimates are too high in the near term.**"

> In similar fashion, SunTrust also focused on the negative impact to the company's credibility with consumers.

> "This is clearly a material event, in our opinion. **The breach compromises Equifax's reputation as a trusted steward of consumer data, and will create a near-term business disruption**, per the company's public comments," analyst Andrew Jeffrey wrote in a note to clients Thursday.

(Emphases supplied).

## VIII.  THE DISCLOSURE OF THE DATA BREACHES WIPES OUT OVER 28.39% OF EQUIFAX's MARKET CAPITALIZATION

### A.     Equifax Common Stock Price Declined Precipitously

108.  As stated above, on September 7, 2017, Equifax disclosed the data breach.  On this news, Equifax's market capitalization fell $2.35 billion, a 13.68% drop, as Equifax's stock price went from $142.72 per share on September 7, 2017 to $123.23 per share on September 8, 2017.   Indeed, as of September 15, 2017, Equifax's common stock traded as low as $92.98 – approximately 35% below where the common stock was trading pre-announcement of the data breach.  As of the filing of this Complaint, Equifax is trading at a price of $108.92 per share.

**B.    Equifax Subject to Numerous Lawsuits by Investors and Consumers**

109.  Federal, state and local government agencies, including the U.S. Department of Justice, the SEC and the U.S. Department of Labor, and state attorneys general and prosecutors' offices, as well as Congressional committees, have undertaken formal or informal inquiries, investigations or examinations arising out of the Company's most recent data breach and announced by the Company on September 7, 2017.

110.  Further, a number of lawsuits have also been filed by non-governmental parties seeking damages or other remedies related to the Company's data breach.  In fact, as of October 23, 2007, at least twenty-three class action cases have been filed.

## IX.    DAMAGES

111.    As a result of the Individual Defendants' wrongful conduct, Equifax disseminated improper financial statements that misrepresented the Company's knowledge of the data breaches. These improper statements have devastated Equifax's credibility as reflected by the Company's more than 13.68% market capitalization loss following the acknowledgment of the data breach on September 7, 2017.    Additionally, Equifax is now the subject of a securities class action alleging securities laws violations in connection with the improper financial reporting.

112.    Further, Equifax's failure to timely alert its users of the data breaches violated numerous state laws. Equifax is now subject to consumer class actions that allege it violated these disclosure obligations and that the Company failed to take appropriate steps to keep its users' data safe. The Company will face substantial costs in connection with the consumer and securities class action lawsuits.

113.    The Company is now subject to investigations by the SEC concerning the disclosure of the data breaches. Equifax will incur substantial costs in responding to these investigations.

114.    Equifax will also likely lose users and the associated revenues from those users, as a result of the data breaches.

115. Equifax also paid substantial compensation to directors and officers that breached their fiduciary duty and violated federal securities laws. The retention of this payment by the Individual Defendants is unfair and unjust.

## X.    INSIDER SALES

116. Equifax has acknowledged that it discovered the unauthorized access on July 29, 2017, but has failed to inform the public why it delayed notification of the Data Breach to consumers until September 7, 2017.    Instead, Equifax executives took advantage of the delay and sold at least $1.8 million worth of shares before the public disclosure of the breach as follows:    Chief Financial Officer John Gamble sold shares worth $946,374; Joseph Loughran, President of U.S. Information Solutions for Equifax, exercised options to dispose of stock worth $584,099; and the Company's President of Workforce Solutions, Rodolfo Ploder, sold $250,458 of stock on August 2, 2017.

117. Information regarding the Data Breach was material and nonpublic information until it was disclosed by Equifax on September 7, 2017.    Defendants Gamble, Loughran and Ploder were aware of Equifax's history of data breaches. By virtue of their positions within Equifax, and Equifax's public statement that it "acted immediately to stop the intrusion and conduct a forensic review", defendants Gamble, Loughran and Ploder were aware of the data breaches that had occurred between May and July 2017, just prior to their stock sales.

46

118. Defendants Gamble, Loughran and Ploder knew, recklessly disregarded, or should have known, that acting with knowledge of material and nonpublic information was a breach of a fiduciary duty to keep Inside Information confidential.

119. By virtue of the foregoing, Defendants, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce, or of the mails, or a facility of a national securities exchange, directly or indirectly: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices or courses of business which operated or would have operated as a fraud or deceit upon persons.

120. Defendants thereby violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

121. Plaintiff was an owner of Equifax stock contemporaneously with Defendants Gamble's, Loughran's and Ploder's sale of their Equifax stock.

## XI.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

122. Plaintiff brings this action derivatively in the right and for the benefit of Equifax to redress injuries suffered, and to be suffered, by Equifax as a direct result of violations of the federal securities laws, breach of fiduciary duties, and

unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. Equifax is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

123.    Plaintiff will adequately and fairly represent the interests of Equifax in enforcing and prosecuting its rights.

124.    Plaintiff was a stockholder of Equifax at the time of the wrongdoing complained of, has continuously been a stockholder, and is a current Equifax stockholder.

125.    The current Board of Equifax consists of the following eleven Individual Defendants: Daleo, Driver, Feidler, Hough, Humann, Marcus, Marshall, McKinley, Smith, Stock and Templeton. Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because Defendants Daleo, Driver, Feidler, Hough, Humann, Marcus, Marshall, McKinley, Smith, Stock and Templeton Face a Substantial Likelihood of Liability for Their Misconduct**

126.    As alleged above, Individual Defendants Daleo, Driver, Feidler, Hough, Humann, Marcus, Marshall, McKinley, Smith, Stock and Templeton violated section 14(a) of the Exchange Act by at least negligently making the misstatements and omissions in the 2016 Proxy and 2017 Proxy. Accordingly,

demand is excused because a majority of the Board faces a substantial likelihood of liability.

127.   Individual Defendants Daleo, Driver, Feidler, Hough, Humann, Marcus, Marshall, McKinley, Smith, Stock and Templeton also breached their fiduciary duty of loyalty by making and allowing improper statements to be made in the Company's public statements, including its Annual and Quarterly Reports, and Proxy Statements. In addition, these Board members allowed the Company to delay announcing the data breaches, despite the Company's knowledge of it, exposing Equifax to massive liability in the consumer class actions. Accordingly, demand is futile.

128.   As members of the Audit Committee, Defendants Templeton, Daleo, McKinley and Hough, were responsible under the Audit Committee Charter in effect during the relevant period for reviewing and approving quarterly and annual financial statements and Equifax's internal controls, as described above. Despite these duties, the Audit Committee Defendants knowingly or recklessly reviewed and approved improper financial statements. The Audit Committee Defendants also reviewed and approved Equifax's ineffective internal controls. Accordingly, these defendants face a sufficiently substantial likelihood of liability for breach of their fiduciary duty of loyalty. Demand upon these defendants is futile.

49

129. Plaintiff has not made any demand on the other stockholders of Equifax to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)    Equifax is a publicly held company with over 120 million shares outstanding and thousands of stockholders;

(b)    making demand on such a number of stockholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of stockholders; and

(c)    making demand on all stockholders would force plaintiff to incur excessive expenses, assuming all stockholders could be individually identified.

## COUNT I

**Against Defendants Copeland, Daleo, Driver, Feidler,
Hough, Humann, Marcus, Marshall, McKinley, Smith, Stock
and Templeton for Violation of Section 14(a) of the Exchange Act**

130. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

131. The section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of Director Defendants Copeland, Daleo, Driver, Feidler, Hough, Humann, Marcus, Marshall, McKinley, Smith, Stock and Templeton. The section 14(a) Exchange Act claims alleged herein do not allege and do not sound in

fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the non-fraud claims.

132. Director defendants Copeland, Daleo, Driver, Feidler, Hough, Humann, Marcus, Marshall, McKinley, Smith, Stock and Templeton negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders which were contained in the 2016 Proxy and 2017 Proxy.

133. The misleading information contained in the 2016 Proxy and 2017 Proxy were material to Equifax's stockholders in determining whether or not to elect defendants Copeland, Daleo, Driver, Feidler, Hough, Humann, Marcus, Marshall, McKinley, Smith, Stock and Templeton. This information was also material to the integrity of these directors that were proposed for election to the Board. The proxy solicitation process in connection with the 2016 Proxy and 2017 Proxy was an essential link in the re-election of nominees to the Board.

134. Plaintiff, on behalf of Equifax, thereby seeks relief for damages inflicted upon the Company based upon the misleading 2016 Proxy and 2017 Proxy.

135. Because of the false and misleading statements in the Preliminary Proxy, plaintiff and the Company are threatened with irreparable harm.

## COUNT II

### Against the Individual Defendants for Violation of
### Section 20(a) of the Exchange Act

136.  Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

137.  The Individual Defendants acted as controlling persons of within the meaning of section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of Equifax and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

138.  Each of the Individual Defendants was provided with or had unlimited access to copies of the 2016 Proxy and 2017 Proxy and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

139.  In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular

transactions giving rise to the data breaches as alleged herein, and exercised the same. The 2016 Proxy and 2017 Proxy contain the unanimous recommendation of each of the Individual Defendants to the stockholders to vote in favor of the election of directors. They were, thus, directly involved in the making of these documents.

## COUNT III

### Against the Individual Defendants for Breach of Fiduciary Duties

140. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

141. The Individual Defendants owed and owe Equifax fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Equifax the highest obligation of due care, loyalty, and good faith.

142. The Individual Defendants, and each of them, violated and breached their fiduciary duties.

143. As a direct and proximate result of defendants' failure to perform their fiduciary obligations, Equifax has sustained significant damages. As a result of the misconduct alleged herein, these Defendants are liable to the Company.

144. Plaintiff, on behalf of Equifax, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Unjust Enrichment

145.  Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

146.  By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Equifax. The Individual Defendants were unjustly enriched as a result of the salaries, bonuses, and other forms of compensation they received while breaching their fiduciary duties owed to Equifax.

147.  Plaintiff, as a stockholder and representative of Equifax, seeks restitution from these defendants, and each of them, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

148.  Plaintiff, on behalf of Equifax, has no adequate remedy at law.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests the following relief:

A.    Against the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' violation of securities law, breaches of fiduciary duties, and unjust enrichment;

B.     Directing Equifax to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Equifax and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote the following Corporate Governance Policies:

1.     a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

2.     a provision to permit the stockholders of Equifax to nominate at least three candidates for election to the Board;

3.     a provision requiring immediate disclosure to affected users in the event of a data breach; and

4.     a proposal to strengthen Equifax's internal controls over securing consumer and business information within its control;

C.     Extraordinary equitable and/or injunctive relief as permitted by law, equity, and State statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting Defendants' assets so as to assure that plaintiff, on behalf of Equifax, have an effective remedy;

D.    Awarding to Equifax restitution from the Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

E.    Awarding to plaintiff reasonable attorneys' fees, consultant and expert fees, costs, and expenses; and

F.    Granting such other and further relief as the Court deems just and proper.

**COHEN COOPER ESTEP & ALLEN LLC**

By: /s/Steven J. Estep
Steven J. Estep
Georgia Bar No. 250450
sestep@ccealaw.com
Jefferson M. Allen
Georgia Bar No. 010898
Jallen@ccealaw.com

3330 Cumberland Boulevard
Suite 600
Atlanta, Georgia 30339
Telephone: (404) 814-0000
Facsimile: (404) 816-8900

**HACH ROSE SCHIRRIPA & CHEVERIE LLP**
Frank R. Schirripa
Daniel B. Rehns
112 Madison Avenue, 10th Floor
New York, New York 10016
Telephone: (212) 213-8311

*Counsel for Plaintiff and the Class*

November 3, 2017

UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| **TEAMSTERS LOCAL 443 HEALTH SERVICES & INSURANCE PLAN**, on behalf of herself and all others similarly situated, | Case No. |
| Plaintiff, | |
| -against- | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| John W. Gamble, Jr., Joseph M. Loughran, III, Rodolfo O. Ploder, Richard F. Smith, James E. Copeland, Jr., Robert D. Daleo, Walter W. Driver, Jr., Mark L. Feidler, G. Thomas Hough, L. Phillip Humann, Robert D. Marcus, Siri S. Marshall, John A. McKinley, Elane B. Stock and Mark B. Templeton, | |
| Defendants, | |
| and, | |
| Equifax, Inc., | |
| Nominal Defendant, | |

## VERIFICATION AND AFFIDAVIT OF SALVATORE J. ABATE

1.     My name is Salvatore J. Abate, I am the Labor Co-Chairman for the Teamsters Local 443 Health Services & Insurance Plan.  I am authorized to act on its behalf in this matter, and being duly sworn, deposes and says:

2.     I verify that I have reviewed the Verified Shareholder Derivative Complaint (the "Complaint") to be filed in this action and that the facts stated in the Complaint, as they concern my own acts and deeds, are true to my personal knowledge.     I believe the facts pleaded in the Complaint on information and belief or investigation of counsel are true.

3.     I have not received, been promised or offered and will not accept any form of compensation, directly or indirectly, for prosecuting this action or serving as a representative party in this action except (i) such fees, costs or other payments as the Court expressly approves to be paid to me or on my behalf, or (ii) reimbursement, by my attorneys, of actual and reasonable out-of-pocket expenditures incurred directly in connection with the prosecution of this action.

By: _____

Salvatore J. Abate
Labor Co-Chairman
Teamsters Local 443 Health Services &
Insurance Plan

2

STATE OF CONNECTICUT                    )
                                        ) ss.:
COUNTY OF NEW HAVEN                     )

Then personally appeared before me the above-named Salvatore J. Abate

and proved to me on the basis of satisfactory evidence to be the person whose name

is subscribed to the within instrument and acknowledged to me that he executed the

same in his authorized capacity and as his respective free act, and that by his

signature on the instrument, the person, or the entity upon behalf of which he acted,

executed the instrument.

WITNESS my hand and official seal:

_____
Notary Public
My Commission Expires:

JENNIE M. D'AMATO
Notary Public, State of Connecticut
My Commission Expires Aug 31, 2019

3